(Decided Oct. 29th, 1861.)

# JOSEPH B. VARNUM and WM. H. ASPINWALL, *vs.* CHARLES M. THRUSTON.

C. having made certain contracts for the purchase of coal lands, entered into an *agreement* with V. and A., by which these contracts were trans-ferred to the latter, who were to provide the funds necessary to complete the contracts, and were then to hold the lands (subject to their claim to be reimbursed the cost thereof) for the joint benefit of themselves and C., in equal half parts, and to dispose of them thus—they are to form, under the general mining law, a company for mining coal on these lands, the capital of which shall be fixed at a sum equal to the value of the lands, to be divided into shares of $100 each, and convey to the company so formed, these lands, in payment of the stock to be issued in their names, and shall, out of the stock so issued, sell *sufficient* to reimburse them the cost of the land and $15,000 agreed to be paid to C., and which is to be treated as a charge upon the lands, *and also* raise not less than $200,000 as a working capital to the company, which, *when so raised,* shall be paid into the company for the benefit of the stockholders, and *after* making the sales and payments aforesaid, shall *next* transfer *one-twentieth part of the whole of said capital stock* to the *complainant,* and the *balance* of the stock *then* remaining, shall belong one-half to C. and the other half to V. and A. A company was formed, and its stock sold. HELD:

1st. That the right of the complainant to the one-twentieth was *contingent,* and not *fixed* and *certain,* being payable only *after* the claims for reim-bursement for the cost of the lands, and the $15,000 which are *priorities* over it, and having a *preference* only to the distribution of the *balance* of the stock.

2nd. Examples cited on the question of construction from cases where wills and testaments were the subject of consideration, do not apply here; this case and the like are to be governed by the principles recognized in the construction of deeds.

The rules for the interpretation of contracts, are all subordinate to the leading principle, that the intention of the parties, to be collected from the *entire* instrument, must prevail, unless inconsistent with some rule of law.

The maxim that the words of a writing shall be taken most strongly against the party employing them, applies only to cases of ambiguity in the words, or where the exposition is requisite to give them lawful effect; it is a rule of strictness and rigor, and not to be resorted to but where other rules of exposition fail.

The modern and more reasonable practice is to give to the language its just sense, and to search for the precise meaning, and one requisite to give due and fair effect to the contract, without adopting either the rule of a rigid or indulgent construction.

Instruments cannot be construed by what parties may have done under them, but the courts may regard the nature of the transaction and probable results, that is, such as may be supposed to have entered into the minds of the parties at the time the agreement was made.

APPEAL from the Equity Side of the Circuit Court for Allegany county.

The bill in this case was filed on the 6th of August 1856, by the appellee against the appellants and The Ocean Steam Coal Company, James L. Graham and Jerry Cowles.

From the record in the case, it appears that prior to January 1853, the defendant, Jerry Cowles, of the city of New York, by various contracts with the owners of coal lands in Allegany county, became entitled to a very large body of the Big Vein of coal, which had been purchased by him at prices deemed by him and others as greatly less than the intrinsic value of the property. The defendant, Graham, and the complainant, Thruston, having conferred together, it was arranged that the complainant should see Cowles, and endeavor to procure his assent to the transfer to the defendant, Graham, and others, of certain portions of the property so purchased. After various negotiations, which need not be stated, the following contract was entered into between Cowles and the

appellants, Varnum and Aspinwall, dated the 24th day of January 1853:—

"*Memorandum of an agreement* made this twenty-fourth day of January, one thousand eight hundred and fifty three, between Jerry Cowles, of the city of New York, of the first part, and Joseph B. Varnum and William H. Aspinwall, of the same place, of the second part.

"Whereas the said party of the first part hath made contracts with various persons for the purchase of coal lands in the State of Maryland, (which contracts are hereinafter more particularly stated and referred to,) and has, in order to procure the assistance of the said parties of the second part in performing the said contracts, and working the mines thereon, agreed to admit them to an equal participation with him in a half part of the benefits and advantages to be derived from the said contracts, and to that end to assign and transfer to them all of the said contracts upon the terms and conditions herein contained.

"Now this indenture witnesseth as follows, that is to say:

"*First.*—The said party of the first part, in consideration of the agreements and stipulations herein contained on the part of the said parties of the second part, and of the sum of ten dollars to him in hand paid by them, the receipt whereof is hereby acknowledged, has granted, bargained, sold and conveyed, and he hereby grants, bargains, sells and conveys to the said parties of the second part, and their heirs and assigns forever, all and singular the several contracts mentioned and referred to in the schedule hereto annexed, and all his right, title and interest therein, and in and to the lands and premises in said contract described or referred to, excepting thereout and therefrom his interest in the contract with the George's Creek Iron and Coal Company, and in the contract with George Staup, so far as such interest relates to lands not referred to in said schedule, and not intended to be affected thereby.

"*Second.*—The said parties of the second part are to provide the funds necessary to complete the said contracts, so far as the same relate to the lands in the said schedule mentioned,

and they are to receive the conveyances of the title to the said land.

"*Third.*—The said parties of the second part are to hold the said lands (subject to their claim to be reimbursed the cost thereof and all expenses in relation thereto) for the joint benefit of themselves and the said party of the first part, in equal half parts, and they are to dispose of the same in the mode herein directed.

"*Fourth.*—The said parties of the second part, and their associates, shall form a company, under the general law passed by the Legislature of the State of Maryland, at the session of 1851, for the formation of mining companies, for the purpose of mining the coal on the said land. The capital stock of the company shall be fixed at such sum as the parties of the second part shall consider the value of the said lands will admit, and said stock shall be divided into shares of one hundred dollars each. The parties of the second part, *as soon as* they shall obtain the title to the aforesaid lands, shall sell and convey the same to the company so to be formed, in payment of said capital stock, which stock shall be issued in their names.

"*Fifth.*—The parties of the second part shall, out of the stock so issued to them, sell sufficient to reimburse them the cost of the said land, and all charges and expenses to which they may be put in relation thereto, with the interest thereon, and also the sum of fifteen thousand dollars and interest, agreed by them to be paid to the said party of the first part, as hereinafter provided, and also to raise the sum of not less than two hundred thousand dollars, to improve the said property, and to furnish a working capital to the said company; which sum of two hundred thousand dollars, when so raised, shall be paid into the company for the benefit of the stockholders. The parties of the second part, after making the sales and payments aforesaid, shall next transfer one-twentieth part of the whole of the said capital stock to Charles M. Thruston, and the balance of the said stock then remaining shall belong one-half to the party of the first part, and the

same shall be transferred to him, the other half shall belong to the parties of the second part.

"*Sixth.*—The parties of the second part, when they shall pay the first instalment on the said contract, shall also pay the said party of the first part the sum of fifteen thousand dollars, to reimburse him for the moneys expended in obtaining the said contracts, and in and about the said lands, which sum and interest is to be treated as a charge on the said lands, in the hands of the parties of the second part, and is to be paid to them in the same manner as above provided for the payment of the purchase money.

"*Seventh.*—The said company, when formed, shall take two out of the three rooms which the party of the first part has hired in the Metropolitan Bank building, in the city of New York, and shall pay the sum of three thousand dollars per annum therefor, the rent stipulated to be paid by the said party of the first part for the three rooms, being four thousand dollars per annum. In witness whereof, the parties to these presents have hereto set their hands and seals, the day and year first above written.         JERRY COWLES,      [L. S.]

J. B. VARNUM,      [L. S.]

In presence of            W. H. ASPINWALL.   [L. S.]

R. L. Joice,

James Lorimer Graham,

J. B. Varnum, Jr."

"*Schedule* referred to in the annexed agreement:

"1.—Contract between Jerry Cowles and Henry Koontz, dated June 1st, 1852, for 600 acres of land in Allegany county, in the State of Maryland, at $110 per acre.

"2.—Contract between Jerry Cowles and Thomas Wright, dated June 15th, 1852, for 680 acres of land in said county, at $100 per acre.

"3.—Contract between Jerry Cowles and Elisha Coombs, dated July 23rd, 1852, for 350 acres of land in said county, at $100 per acre.

"4.—Contract between William Humbertson and Douglas Percy, dated June 28th, 1852, for 255 acres of land in said

county; said contract was, as signed by said Percy to said Cowles, July 3rd, 1852, for consideration of $2540.

"5.—So much of a contract made between said Cowles and The George's Creek Coal and Iron Company, bearing date December 30th, 1852, as relates to lands in said county, lying west of George's creek, and also east of said creek and north of Neff's run, (supposed to contain 300 acres,) at a price of $250 per acre.

"6.—So much of a contract between said Cowles and George Staup, dated Sept. 1st, 1852, as relates to land lying west of George's creek, and north of Neff's run, supposed to contain from 50 to 70 acres, and that portion of purchase money applicable thereto, being estimated at $7,000."

As the decision in this case depends entirely upon the construction of the above contract, it is only necessary to state, in addition, that the company provided by that agreement to be formed, was so formed on the 27th of October 1855, and called "The Ocean Steam Coal Company of Allegany county," and by the articles of association forming the company, it was stipulated that its capital stock should consist of $1,000,000, divided into 10,000 shares, of $100 each, that being the amount which "the said Varnum and Aspinwall, and their associates, consider the value of the lands mentioned in said agreement, including the number of shares to be subscribed by the nine directors named in the certificate of incorporation." Varnum and Aspinwall jointly subscribed for 9991 shares of this stock, (including the whole, save one share each subscribed for by the nine directors,) to be paid for in the conveyance to the said company of the legal title to all the lands mentioned in the said agreement, so far as the said Varnum and Aspinwall had obtained the legal title to the same, and by a conveyance and assignment of their equitable title to all said lands, to which they had not been able to obtain the legal title, subject however to all the rights of the respective parties to said agreement. It was also stipulated as part of this subscription, that Varnum and Aspinwall should pay off certain mortgages on the lands executed by Graham; and that until such payment should be made, the company

should be at liberty to retain a proportional part of the stock as security for such payment. Afterwards Varnum and Aspinwall did convey to the company parts, but not all, of the lands embraced in their subscription. They did not pay off the mortgages given by Graham, but left them remain as liens. In this state of the case the whole 9991 shares subscribed for by Varnum and Aspinwall, were offered for sale in the city of New York, at public auction, on the 1st of July 1856, and were sold for the gross sum of $376,612, which sum was not sufficient to cover the asserted liens of Varnum and Aspinwall, and to satisfy the unpaid mortgages.

The complainant, in his bill, insists that the defendants, Varnum and Aspinwall, were bound by their agreement with Cowles, to form a company and transfer to the complainant, *at all events* and in *any contingency*, one-twentieth part of the whole capital stock of said company, and he further insists that they were bound to provide, at all events and in any contingency, a working capital for said company of at least $200,000, and the complainant therefore asks specifically for 500 shares (being one-twentieth) of the capital stock of the company which had been formed, and that the said Varnum and Aspinwall might be required to supply said company with a working capital of $200,000. The complainant further insists that it was the duty of Varnum and Aspinwall to have formed said company within a reasonable time, and charges that they have been guilty of gross neglect of their duties in various specified particulars, and of inexcusable delay in forming the company, which caused, as a necessary consequence, accumulation of interest and loss of profits, and he claims an account for losses sustained by these alleged improper acts and neglects of Varnum and Aspinwall.

The defendants, in their answers, deny this construction of the agreement, and insist that the right of the complainant was *dependent* on the result of the sale of stock, their theory being that the advances of Varnum and Aspinwall, with interest, were *first* to be fully paid, as a primary charge on the proceeds of the stock, that *then* the working capital was to be raised, next in order as next in priority, and *in case*, and *only*

in case, there should be a surplus of stock, was the complainant to have stock equal to one-twentieth of the whole capital stock of the company. The answers also deny the other allegations of the bill.

Testimony was then taken, and the court below, (PERRY, J.,) upon the hearing of the cause, delivered the following opinion:

"'The amount involved in this cause, the interest felt, and the questions to be decided, are of so much consequence, as to be to me a cause of much reflection and concern. I regard the case as involving but one point, which may be esteemed as controlling its final result.

"In the argument I have not been referred to any authority to show that a contract made (as in this case) between persons in which the complainant was not a party, he, (the complainant,) could avail himself of a provision or trust inserted for his benefit. I have, however, investigated the question, and find the law to be well settled, that in all cases in which parties, other than the *cestui que trust*, executes an instrument in which trusts or equitable rights are secured to such *cestui que trust*, and the trustee accepts and acts upon the trust, and executes it so as to prevent a revocation of his acts, then it becomes an executed trust, which will not only bind the trustee, but the person who conveyed the property, &c., and will be enforced against himself and his representatives. In this case, the duties of the parties to the agreement, (Varnum and Aspinwall,) have been so far performed as to leave no possible difficulty in that respect, in regard to the trust, or equitable rights which are sought to be enforced on the behalf of the complainant.

"By the articles of agreement made between them, (Cowles, Varnum and Aspinwall,) it is agreed that they (Varnum and Aspinwall) should provide the funds necessary to complete the contracts made by Cowles, and that they were to hold the lands, (subject to their claim, to be reimbursed the costs thereof, and all expenses in relation thereto,) for the joint benefit of themselves and Cowles, in equal half parts, and to be disposed of in the manner directed by the agreement.

They (Varnum and Aspinwall) were to form a company under the general law of this State, passed in 1851, its capital stock to be fixed by them, and to be issued in their (Varnum and Aspinwall's) names. They were also, out of the stock so issued, to sell sufficient to reimburse them the cost of the land, and all charges and expenses to which they might be subject, and pay the sum of $15,000, and to raise not less than $200,000 to improve the property and furnish a working capital to said company. And that after making the sales and payments aforesaid, they should next transfer *one-twentieth part of the whole of said capital stock to Charles M. Thruston,* and the balance of said stock then remaining shall belong, one-half to Varnum and Aspinwall, and the other half to Cowles. The company was organized and the stock issued, and the same has been sold to various persons, and the proceeds of such sales are now held by the defendants, (Varnum and Aspinwall,) as they insist, to be applied to the preferences and charges provided for in the agreement.

"I deem it proper to suggest, that by the original agreement it is provided that Varnum and Aspinwall, after making sales and payments, &c., shall next transfer 'one-twentieth part of the *whole* of the said capital stock to Charles M. Thruston,' when in the answers of the defendants, The Ocean Steam Coal Company, William H. Aspinwall, Joseph B. Varnum, are exhibited copies of the agreement, in which the words 'whole of,' in that part of the contract, are omitted, but are found in the exhibit made in the answer to James L. Graham. The discrepancy *in the original agreement and copies exhibited in the answers, in regard to that part of it,* is adverted to for the purpose of avoiding an impression that I have in this opinion improperly quoted its provisions and words, as such might be done by a reader who compares what I quote with the copies exhibited with the answers.

"This instrument is to be interpreted by me. What was the design and intention of that agreement in regard to Charles M. Thruston? Was he in all events to be entitled to "one-twentieth part of the whole capital stock?" or was the stock liable to be sold, and all right and title of Thruston

to be devoted, &c., to reimburse the defendants, and raise the $15,000 and $200,000 provided for in the agreement?

"Much has been said in regard to matters and circumstances outside of the contract, and yet all must concede that it is to be decided and interpreted by the words and language used in that instrument. If I were disposed, I could not indulge in conjectural designs and purposes of the parties. The law has wisely environed judges with rules of construction upon which they cannot infringe. Rules that are to be regarded and esteemed of controlling influence in the interpretation of agreements, and when known and established, cannot be impaired but by the use of legislative authority.

"On the part of the complainant, it is insisted that the duty to make the transfer to him is peremptory; that his right is not dependent upon a contingency, and that the transfer was postponed for reasons other than those assigned by the defendants; that it was unconditional, and that no part of the agreement will authorize this court to determine that his rights depended upon the amount of sales, &c. The defendants urge that the transfer was postponed until after *making the sales and payments,* and that the right of the complainant is made dependent upon that event; that notwithstanding this contingency is not expressed in terms, it is to be implied, in order to render the several clauses of the agreement consistent with each other, and the entire article consistent with the preceding articles; that the transfer was to be made to Col. Thruston, in the event, and only in the event, that after making the sales and payments already directed, there should remain stock in the hands of Messrs. Varnum and Aspinwall sufficient for that purpose. The argument on the part of the defendants is, that though the contingency upon which the title of the complainant to the stock is to be defeated or denied to him, is not expressed, the law will imply it, in order to render the several clauses of the agreement consistent with each other.

"I have with much care investigated the question, whether the law will authorize such an implication, and I cannot hesitate to believe the rule of construction, 'that the express men-

tion of one thing implies the exclusion of another,' or, as is otherwise worded, *expressum facit cessare tacitum*, annunciates one of the first principles applicable to the construction of deeds, and that when there is an expressed contract between parties, none can be implied, (4 *Law Lib.*, 183;) that there cannot be an implied contract, contradictory of express covenants, but there may be implied covenants which are consistent with those expressed in the deed, and express covenants always qualify and restrain those that are implied within the import and effect of the express covenants, so that the former shall never be broader than the latter; *Kent vs. Welch,* 7 *Johns.*, 259; *Gates vs. Caldwell, et al., 7 Mass.,* 69; and that an implied covenant will be regarded as sufficient, but not when there is an express one on the same subject, for then the parties are restrained by the letter. *Archibald's Landlord and Tenant*, 39. *Morris vs. Harris*, 9 *Gill*, 19. *West vs. Flannagan,* 4 *Md. Rep.*, 58.

"In the answers, no averment is made of fraud, surprise or mistake in the agreement, or in any part of it. Much doubt might be indulged in, if I were unaided by authority as to the principles controlling this court. The law is well understood to be, in this State, that 'whatever may be the doctrine elsewhere, we are to consider the law well settled in Maryland, that parol evidence is inadmissible in a case like the present one, to contradict, add to, or vary the terms of written instruments; and although a court of chancery will, upon proof of fraud, mistake or surprise, raise an equity by which the agreement will be rectified, according to the intent of the parties, it will not interfere when the instrument is such as the parties designed it to be. For if they voluntarily choose to express themselves in the language of the deed, they must be bound by it.' *Wesley vs. Thomas*, 6 *H. & J.*, 24. *Watkins vs. Stockct*, 6 *H. & J.*, 435. *Bend vs. Susquehanna Bridge Co.*, 6 *H. & J.*, 128. *Jones vs. Hardesty,* 10 *G. & J.*, 404. It is also well understood to be the law of this State, 'that our courts must regard it as a sound rule of construction, that if *possible*, unless it contravenes some rule of law, every *part* of a deed, and the intention of the parties,

shall prevail; *George's Creek Coal & Iron Co. vs. Detmold,* 1 *Md. Rep.*, 239; *Waters vs. Griffith,* 2 *Md. Rep.*, 326; that contracts are to be interpreted and enforced according to the fair import of the terms, without reference to the hardships that may fall on the parties; if persons voluntarily express themselves in writing, they must be bound by the language employed. *Abbott vs. Gatch,* 13 *Md. Rep.*, 315. Nor can a court be aided in the construction of a written contract by acts which the party may have done under it, nor is a party bound by any construction which he may have put upon the instrument. *Ringold vs. Ringold,* 1 *H. & G.*, 74.

"In the agreement, there is an express covenant, that after making the sales and payments, &c., Varnum and Aspinwall shall next transfer one-twentieth part of *the whole of the said capital stock to Charles M. Thruston.* The effort on the part of the defendants, is to show that the words 'shall transfer one-twentieth part of the whole of said capital stock,' must be dependent upon the right to sell for the purpose of reimbursing the advances on the part of the defendants; and that the transfer of such stock is contingent, being postponed to a period of time (after sales) which, irresistibly and necessarily, must mean that the whole of the stock was charged with its payment; that *the whole instrument is to* be construed, and every one of its provisions is to be considered, and so interpreted as to accomplish the intention and design of the respective parties executing it, and that that intention is, that the whole was liable to be sold to reimburse, &c. It is no doubt the general rule, that every part of an agreement is to be considered, in order to arrive at the meaning of the parties to it. It may be observed, however, that it will be found impossible to lay down one fixed and uniform rule, comprising all the cases which may arise. It is always a question of intention, and courts have announced the rule of law to be, "that though it may be hard that the use of a certain form of expression should fasten upon a party a liability, when there are other expressions which raise a doubt as to whether he intended that such should be the case; and, on the other hand, it would be dangerous if judges were to permit them-

selves (which they have no right to do) to indulge in vague conjectures about the hardships of cases, and to consider, ingeniously, what the parties must have meant, when the words used are clear and precise, admitting of no ambiguity at all." Words of a covenant may be restrained by other words in the deed, if we can see a clear intention to restrain them from the other parts of the deed; but it would be a very dangerous rule, if it were to be applied to every case where ingenuity can show that by giving the natural meaning to the words of the general covenant, other words in other parts of the deed might be rendered nugatory. *Rawle on Covenants for Title,* 383.

"By the authorities to which I have referred, it will be seen that the established rule of law is, that an *express covenant* cannot be limited or enlarged by the operation of implied covenants contained in the same instrument. The agreement in this cause is express, that the complainant 'shall have the twentieth part of the whole of said capital stock." To charge it (the stock) with the right of Varnum and Aspinwall to sell, to pay the purchase money, to reimburse them, can only be determined by an implication of the meaning of the parties. Can I, therefore, construe the agreement to mean that 'the one-twentieth part of the whole of said capital stock' was not to be transferred, but upon a contingency? was dependent upon the fact or event that the stock was to bring, by a sale, the sum necessary to reimburse the defendants, Varnum and Aspinwall? If such were done, I would have to divest the words 'the one-twentieth part of the whole of the said capital stock,' of all meaning; I would have to interpolate by conjecture (which judges are not permitted to do) or by implication, which the authorities forbid, words restraining and qualifying the express covenant of the parties. They have agreed, in language by no means susceptible of misinterpretation, that at a specified period, he (Thruston) should have 'one-twentieth part of the whole capital stock; it is not that after the sale, if sufficient remains, he is to have that part, but the time of its transfer is limited, not the amount.

"It is also insisted, that because the agreement limits the time of the transfer of the stock to a period after the sale, the conclusion is irresistible, that it means, if enough or sufficient remains to fulfil that intention, that then it is to be transferred. The answer to be given to this is, that the agreement contains an express covenant to give the one-twentieth of the whole of said capital stock to the complainant, and that that cannot be qualified or restrained but by implication, which implication the rules of law will not authorize this tribunal to indulge in. The agreement is so worded that much may be urged on either side. One thing, however, is very apparent to me, that is, that all parties contemplated that more stock would be in the hands of Varnum and Aspinwall than was necessary to pay Cowles and reimburse themselves; and that they believed that there would be stock in their (Varnum and Aspinwall's) hands, after the sale, &c., sufficient to fulfil the covenant in favor of the complainant. Under such circumstances, can I do violence to that apparent intention, and determine that such was not designed by the agreement? Can I give a meaning which requires language other than that which has been used? In other words, that I *will, by implication,* by conjecture, say, that though they have covenanted for the transfer of 'the twentieth part of the whole of said capital stock,' they meant such should be the case, *provided and upon the condition that the sales* would pay the defendants, Varnum and Aspinwall, and leave sufficient surplus. When parties use language of a known and undoubted meaning, conveying and purporting designs which are unequivocal, would not a court be violating the law, by giving to that language a sense other than that which is conveyed by it, unless fraud or mistake is alleged, and is shown to exist?

"It is true that much may be said in regard to what might be intended by postponing the transfer until the sales, payments, &c. But, as suggested, it may be that such was intended to prevent competition in the sale of the stock by Varnum and Aspinwall, as a sale by them was contemplated, and by the agreement was to be made, to raise funds to reim-

burse and provide them a working capital, &c. It is not for me to regard the agreement as giving to the defendants a right to sell, because of that postponement. The parties, so far from having agreed to that, have covenanted, in the plainest words, that at a certain time or period the complainant should have the 'one-twentieth part of the whole of said capital stock;' the postponement to that time does not irresistibly and necessarily carry with it the conclusion, the inference that it should be sold to raise the amount of money required to reimburse the defendants, Varnum and Aspinwall. I have shown the law to be, that an express contract cannot be changed by implication; that judges, if *possible*, must give effect to every word of an agreement; that all the covenants are to be esteemed binding. I cannot, therefore, give the construction asked for on the part of the defendants; some distinct meaning must, if possible, be given to every word in the contract. *Waters vs. Griffith*, 2 *Md. Rep.*, 326.

"Feeling myself bound by the principles of law, I must construe the agreement as I have suggested; otherwise this court would have to disregard the covenants of the parties; would have, by implication, so to interpret the contract as to qualify, indeed destroy, the plain language of the agreement. In other words, determining that it is not possible to give some distinct meaning to every word in the contract, deciding that they have used language which, by the rules of law, impels courts to say they do not mean that which the words used manifestly import, though no fraud, mistake or surprise is alleged; that liability shall not be fastened upon a party because he has used a certain form of expression; and that this court will look at other expressions, so as to raise a doubt and relieve the party from responsibility—relieve him because of probable hardship. This, according to the authorities to which I have adverted, ought not to be done by courts.

"In conclusion, I will say, it is conceded on the part of the defendants to be quite clear that the parties anticipated general profits, expecting that the land, or its representative, stock, would yield largely, more than the sums necessary to set the company in operation, and that their expectations

Varnum & Aspinwall, vs. Thruston.

were not made the subject of covenant on any side. And it is urged that the agreement was entered into by all parties, subject to all the casualties of such adventures, and that the complainant should share in the general disappointment, and loose his entire interest in the stock, &c. If no covenants were made for such an event, how could a court make them? Is it the province of a court of equity to provide for such contracts as may be supposed the parties would have made, if they had foreseen events which it is admitted they did not anticipate; indeed it is quite clear that they expected the land, or its representative *stock*, would yield largely more than the sums necessary to set the company in operation, &c. To give to the agreement a construction different from that which I have indicated in this opinion, must necessarily be upon the hypothesis that the parties intended to sell the entire stock to reimburse the defendants, Varnum and Aspinwall, if necessary for that purpose. And yet it is quite clear that all parties anticipated general profits, which could only be because a large amount of stock would remain unsold, not only the one-twentieth, but more than that; otherwise all the parties could not have expected profits. For without the possession of stock, they could not have received profits, and such was indispensable to enable any of the parties to have realized such an event. It is only by being stockholders they could have been influenced to anticipate the receipt of profits from the adventure.

"It is unnecessary for me to decide the question in regard to the legality of the sale of stock, as the opinion I entertain gives the complainant an undoubted right to the 'one-twentieth part of the stock of the Ocean Steam Coal Company.' And as the defendants, Varnum and Aspinwall, received the whole stock, and were, by the terms of the agreement, to transfer to the complainant that part, I will pass a decree to compel them to carry out the contract, and give the complainant that which is secured to him by that instrument. I have, under the circumstances of this case, determined, in the exercise of the discretion vested in me, that each party shall pay his own costs."

A decree was then passed, on the 21st of November 1859, that the defendants, Varnum and Aspinwall, account with the complainant for the value of 500 shares of the capital stock of The Ocean Steam Coal Company of Allegany county, sold by them on the 1st of July 1856, with interest, but if they or either of them, on or before the 1st of January next, shall elect to transfer to the complainant 500 shares of the stock of said company, and shall actually transfer or cause the same to be transferred to him on or before that day, or if they shall on or before that day, in due form of law, tender a transfer of said shares, and the complainant shall refuse to accept the same, then so much of the decree as requires them to account as aforesaid, will be rescinded.

From this decree both the complainant, and Varnum and Aspinwall, appealed. The appeal of the complainant is still pending, the present appeal being that of Varnum and Aspinwall.

The cause was argued before LE GRAND, C. J., TUCK, BARTOL and GOLDSBOROUGH, J.

*Geo. A. Pearre* and *Thos. S. Alexander*, for the appellants:

By the true construction of the contract of the 24th of January 1853, Varnum and Aspinwall were to receive the titles to the land, and form a mining company upon them, having such capital stock as they should determine, sell *sufficient* to reimburse themselves all costs and expenses in paying for the same, and to pay themselves the $15,000 agreed to be paid to Cowles, $200,000 to improve the property and furnish a working capital, and *then* transfer one-twentieth of the whole of said capital stock, *if* so much should remain unabsorbed by the preceding risks, to the complainant.

It is clear this agreement was framed upon the supposition that, after the sales were made for the purposes above specified, one-twentieth and even more of the stock would be, left, but there is no warranty on the part of Varnum and Aspinwall that it shall be so. There was no reason why

Varnum and Aspinwall should warrant to Thruston the receipt of stock to the amount of $50,000, for two or three days services, in bringing, as he says, two men together, the one to make and the other to receive an abortive proposal: a sheer speculation looking alone to a stock-jobbing contract; taking care of stock speculators and letting honest buyers suffer, and the purchase money go unpaid, and which was rejected as soon as submitted to the calm judgment of such men as Varnum and Aspinwall, because it was a transparent stock-machine.

It is not contended by the other side that there is an *express* covenant on the part of Varnum and Aspinwall, that they warrant to the complainant one-twentieth of the whole stock, but the complainant contends that the warranty is implied from the general tenor of the agreement; on the contrary, we say, that the expressed covenants are irreconcilable with such an implied covenant of warranty, and that express covenants assume or control all which would be implied. 9 *Gill*, 19, 27, *Morris vs. Harris.* There is an express covenant in relation to this very subject matter in the 5th clause: "the parties of the second part, *after* making the payment and sales aforesaid, shall *next* transfer one-twentieth part of the whole capital stock to the said Charles M. Thruston, and the *balance* of the stock then remaining shall belong," &c. Implied covenants are only sustained to supply the place of express agreements—an express agreement negatives an implied inconsistent agreement. 4 *Md. Rep.,* 58, *West vs. Flannagan.*

The words in the last sentence of the 5th clause of the contract—"one-twentieth part of the *whole* of said capital stock"—were inserted clearly to show that the complainant was to have one-twentieth of the *whole,* if so much was left, and not one-twentieth of the *residue;* if only one-twentieth were left, Thruston was to have all, before Varnum and Aspinwall got any. The word *"whole"* was used for that purpose; it fixed the mode of computation as to the residue of the stock.

The counsel for the complainant, to sustain their construc-

tion of the contract, cite certain cases of wills giving legacies. We say that all legatees are presumed to be equally the objects of the testator's bounty, and the expressions in wills, "in the first place," and "in the next place," indicate the mere *order* in which the bequests are *made*, not prescribing a *preference* in payment. 1 *Roper on Legacies*, 294. But where a testator states his *supposition* to be that there will be a residue, and proceeds upon that idea to give other legacies, *those secured* only will abate. 1 *Roper*, 295. This was the supposition in this agreement. Even in the case of legacies, if there is any consideration for a legacy, it does not abate with the rest. 1 *Roper*, 297. The consideration here, for priority of payment of the purchase money, the $15,000 to Cowles, and $200,000 for working capital, is apparent from the very nature of the objects to which they were to be applied. But a will is a gratuity to all the devisees, and no injustice is done in applying a *pro rata* abatement. This, however, is a contract, and is more analogous to deeds of trust creating preferences, where the same words that in a will will not create a priority, will do so in a deed of trust. *Burrill on Assignments*, 258, 259. 7 *Gill*, 455, *Albert & Wife, vs. Winn & Ross.* See, also, 4 *Bac. Abr.*, 526. 2 *Greenlf's Cruise*, 300.

The 5th clause of the contract sets down the order of *payment*, and is not a mere enumeration of subjects provided for on the same basis. The word "*after*," in the clause, "after making the sales and payments aforesaid," is not a mere fixation of time. Such a construction is inconsistent with the charges made on the land for the purchase money, and the $15,000 to Cowles, in the third clause.

It is contended, for the complainant, that it was the *intent* of the parties to this contract that he should have one-twentieth of the capital stock, and that by that intent the contract must be construed, and that to construe it otherwise, is to construe the contract by the *result* of the sale. We say such intent did exist, but *subject* to certain rights in others, and that such subjection to the rights of others is apparent on the *face of the contract*, and it is, therefore, an unsound argu-

Varnum & Aspinwall, *vs.* Thruston.

ment to say that we interpret the contract by the result of the sale.

The rule that the words of a contract are to be taken most strongly *contra proferentem*, is a stringent rule, and only to be resorted to when all other rules fail. 2 *Kent*, 556. All rules of interpretation are subject to the general principle that the *intent* of the parties, as gathered from the *whole* instrument, is to prevail, and, looking to the whole instrument, it seems impossible to gather from it the intention that the complainant was to have the one-twentieth part of the whole stock of this company *at all events*. By the third clause, Varnum and Aspinwall were to hold the lands, *subject* to be reimbursed the *cost* thereof, and all expenses in relation thereto. By the 5th clause, they were to sell a *sufficient* amount of the stock to reimburse them the cost of the land, and all charges and expenses, *and also* the sum of $15,000 to Cowles, (which sum, by the 6th clause, is made a *charge* on the lands in their hands,) *and also* the $200,000 to improve the property, and for a working capital. *Sufficient* of the stock for *these purposes* they were authorized to sell. Now, if this took the *whole*, were they not authorized to sell the whole for these purposes? They were to sell "*sufficient*," that is, "*enough*," to accomplish these results. If this could not be done without selling the *whole*, then they were authorized to sell the whole; and it is only *after* making such sale and *payments* that Thruston is *next* to receive his one-twentieth. He could not get his one-twentieth, or any thing, *till* the *previously declared purposes* had been *subserved*. The whole contract, and all the surrounding circumstances to which the court can look, for the purpose of its construction, establish this to be its true interpretation.

*Chas. B. Thruston* and *Wm. Schley,* for the appellee.

On this appeal the only question open for argument is, the construction of the agreement of the 24th of January 1853, for though the complainant, in addition to one-twentieth of the whole capital stock, asked that Varnum and Aspinwall should be required to supply a working capital of $200,000,

this was refused, as also the account for lost profits. If, therefore, the judge below was not in error in the construction put by him on this agreement, there is no ground of just complaint by Varnum and Aspinwall against the decree, and now in relation to the true construction of this agreement, we respectfully maintain the following propositions:

. 1st. The agreement must be construed agreeably to the *intention* of the parties, existing at the time it was made. It must not be construed by any subsequent event nor by the result. And such intention must be the concurrent intention of both the contracting parties. The very word "agreement" *(aggregatio mentium)* imports the assent of the minds of both parties to the *same thing* in the *same sense.* And, as between the parties to the agreement, the intention must be gathered from the agreement itself. This is an established rule of construction in all courts; equity may, and often does, control the *effect* and *operation* of an agreement; but this must not be confounded with its construction. *Parsons' Merc. Law.,* 14. *Platt on Covenants,* 136 to 146 in 3 *Law Lib.,* 61. *Smith on Cont.,* 407, 412. 1 *H. & G.,* 433, *Union Bank vs. Ridgely.*

2nd. And where the language of an agreement is plain and unambiguous, or by just construction manifests the clear intention of the parties, there can be no implication of an inconsistent intention. 2 *Gill,* 74, *Benson vs. Boteler. Ibid.,* 125, *Jones vs. Plater. Ibid.,* 330, *Gist vs. Drakely.* 4 *Md. Rep.,* 36, *West vs. Flannagan.* 2 *Md. Ch. Dec.,* 201, *Brown vs. Waters.* 1 *Md. Rep.,* 239, *Georges Creek Co., vs. Detmold.* 13 *Md. Rep.,* 315, *Abbott vs. Gatch.*

3rd. It is an established canon of construction that, in construing a written instrument the court should give meaning and operation to every clause and word, provided it can be done consistently with the intention of the parties, and to that end may look to the *motives* that led to the agreement, and to the *object* intended to be effected; and may also look to the *surrounding* circumstances and to the circumstances of the parties; and may suppose new and different *aspects* of the case from those which have actually arisen, in order to

Varnum & Aspinwall, *vs.* Thruston.

ascertain whether a suggested interpretation does or does not comport with the intention of the parties. 1 *G. & J.*, 150, *Wirgman vs. Mactier.* 2 *G. & J.*, 382, *Davis vs. Barney.* 13 *Pet.*, 97, *Bradley vs. Steam Packet Co.* 65 *Eng. C. L. Rep.*, 435, *Edwards vs. Jevons.* 11 *Mees. & Wels.*, 874, *Butcher vs. Steuart.* 1 *Excheq.*, 160, *Goldshede vs. Swan.* 6 *H. & J.*, 411, *Allegre vs. Insurance Co.* 8 *Md. Rep.*, 132, *Jenkins vs. Long & Byrne.* 8 *Johns.*, 90, *Cole vs. Wendell.* 4 *Russ.*, 532, *Lowe vs. Huntingtower.* *Smith on Cont.*, 407, 412. 7 *Md. Rep.*, 537, *Feigley vs. Feigley.* 2 *Md. Rep.*, 326, *Waters vs. Griffith.*

4th. And it is also an established rule that, in the construction of a written paper of doubtful import, or which is reasonably susceptible of two inconsistent interpretations, in relation to the rights of one *not a party to the agreement,* that construction shall be adopted which is most beneficial to such third person: *verba chartarum fortius accipiuntur contra proferentem.* *Co Litt.*, 36, *a.* 2 *Bl. Comm.*, 380. *Broom's Legal Maxims*, 254, in 50 *Law Lib.*, 169. 3 *Ves.*, 48, *Swann vs. Fonnereau.* 12 *East.*, 227, *Mason vs. Pritchard.* 6 *Barn. & Cress.*, 433, *Edis vs. Bury.* 6 *Mees. & Wels.*, 609, *Mayer vs. Isaac.*

5th. Bearing in mind these rules of interpretation, and bearing in mind the fact that Thruston was not a party to the agreement, we respectfully insist that he was entitled to one-twentieth of the whole capital stock; and that by the plain terms of the agreement Varnum and Aspinwall were under an absolute obligation to deliver it without any regard to the result of the speculation in which they had embarked with Cowles. We contend that this is so *upon the language of the agreement* independently of any extrinsic evidence; and that if the agreement be interpreted *in connection with the extrinsic evidence* as to the surrounding circumstances of the parties, the proposition is still more clearly established.

The *extent* of the acknowledged interest of Thruston, in *the only part of the agreement* where that interest is mentioned, is clearly described. It is "one-twentieth part of the *whole* of said capital stock." It is unconditional and un-

qualified. There is not the least ambiguity. The only sug-gested ambiguity arises from other provisions of the agree-ment, which, in the actual event, cannot be fulfilled, and, from the direction, as to the *time* when said one-twentieth was to be transferred to Thruston. It is said in the com-mencement of the 5th clause, that Varnum and Aspinwall, out of the stock, (which, by the previous clause, was to be issued in their name,) should sell *"sufficient* to reimburse their outlay, and to raise $200,000 as a working capital for the company, and "after making the sales and payments afore-said," they should next transfer to the complainant one-twen-tieth part of the whole of said capital stock. And the argu-ment on the other side is, that the duty to transfer, although directed in general terms, without restriction, or condition, is nevertheless to be restrained by construction so as to import a *qualified* engagement. We admit that the *whole* instrument is to be looked at, and that the maxim, *"verba generalia restringuntur ad habilitatem rei vel personam,"* is to be regarded. But that maxim never restricts words so as to exclude from the operation of the instrument, a case, within the apparent object of the parties, and within the ordinary sense of the words used, for this would violate the funda-mental rule which requires, that effect shall be given to such intention of the parties, as they have used fit words to express. *Brown's Maxims,* 276, in 50 *Law Lib.,* 182. But, as we say, it is plain that the direction to sell *"sufficient* stock," meant the same as if it had said sufficient of the *disposable* stock, and it is equally plain, from the recitals in the agreement, that the words, *"after"* and *"next,"* are in-tended to mark the succession of events, in order of time, and not to determine priority of *right;* if it had been otherwise in-tended, apt words would have been used to indicate, that the direction to transfer to the complainant a *specified* proportion of the *whole* of *said* stock was *dependent* on the event of the sales. On the face of the agreement it is shown, that the parties anticipated, *as a certain result,* that there would be a large surplus for equal division between Cowles of the one part, and Varnum and Aspinwall of the other part. It would

be very remarkable if, with this confidence of an assured large balance for such division, they *intended* that the right of Thruston should be a mere *contingent* right. It is a more reasonable construction, that the parties intended merely to *postpone* the *transfer* of the stock in point of *time,* than to adopt the notion that they intended to make it contingent in point of *right.* And it is a fair consideration in deciding upon the intention of the parties, that Varnum and Aspinwall were to have the control throughout; and it is a reasonable suggestion that they may have deemed it expedient to withhold from the complainant the stock *dedicated to him* until *they* had made *their* sales, lest by throwing *his* stock upon the market, Thruston might seriously interfere with the success of their speculation. Besides this the words, taken altogether, naturally and properly refer to the *time of performance* of a prescribed act. 4 *Madd.,* 161, *Beeston vs. Booth.* 1 *Molloy,* 236, *Nash vs. Dillon.* 1 *Collier's Cases in Ch.,* 409, *Thwaites vs. Foreman,* in 28 *Cond. Eng. Ch. Rep.,,* 409, affirmed in 10 *Jurist,* 483. 9 *Paige,* 360, *Sheherd vs. Guernsey.* 33 *Miss.,* 695, *Ellis vs. Kelly.* 1 *Vernon,* 31, *Brown vs. Allen.* 2 *Ves. Sen.,* 420, *Blower vs. Morret.*

But if we look to the surrounding circumstances, and to the circumstances of the parties, we think there can be no reasonable doubt as to the *sense* in which the words, "sufficient stock," the words "one-twentieth part of the whole of said capital stock," and the words "after" and "next," were used and understood by the parties to the agreement. They embarked in a most promising speculation, and their expectations may have been extravagant. But even if they overestimated their expected gains, they did it unconsciously: *Sœpe de facultatibus suis amplius quam in iis est, sperant homines.* 1 *Inst. Title,* 6, *sec.* 3. But the interest of Thruston was *fixed.* In no event could it be *more* than one-twentieth; and it was not intended that it should be less in any event. He was no party to the speculation.

6th. *All* the purchase money was to be paid by Varnum and Aspinwall out of funds to be *originally* provided by *them.*

*Their* right was to be one of *reimbursement* out of the proceeds of the *disposable* stock and nothing more. *Their* lien on the lands was to cease when the lands should be conveyed to the company. The company, by *delivery* of its stock, was to become the owner of a clear and unincumbered title. It was not intended *that the company* should pay any part of the purchase money to the original vendors. It will be seen that the lands are subscribed in payment of 9991 shares, *subject* to the lien of the balance of the purchase money payable to a particular vendor. In two respects this proceeding was erroneous: firstly, the *value* of the stock is really diminished *pro tanto*, by throwing upon the company a debt which was properly payable by Varnum and Aspinwall; and secondly, if the lands *thus encumbered* justified a capital of $1,000,000, the lands *unencumbered* would have justified a proportionate *augmentation* of the stock.

7th. The right of Varnum and Aspinwall to *reimbursement*, and the right of the company to its *working capital* of $200,000, are placed by the agreement *on the same footing*. The complainant, *as one of the stockholders*, has the right to insist that Varnum and Aspinwall, as to their claim for reimbursement, and the company, as to its working capital, were *both* to be raised out of the *disposable* stock; and if a deficiency has occurred *without fault on the part of Varnum and Aspinwall*, then they and the company should contribute *pro rata* to such loss. If the deficiency has arisen, wholly, or in part, from fault on the part of Varnum and Aspinwall, *they* are to be chargeable upon just accounting for the consequence of such fault.

8th. And, as the last point in relation to the *construction* of the agreement, we state, as our interpretation of its meaning, that *Cowles*, by the mere execution of the agreement *ipso facto*, parted with all his interest in *the lands* and gave up all control over them. He was to have no right to act, or to direct in any manner, as to the mode or time of payment for the lands, nor as to the time of the formation of the company, nor as to the amount of capital, nor as to the time or mode of disposing of the stock. His right was limited by the

agreement to one half of the balance of the stock, if any, that would remain after Varnum and Aspinwall should be reimbursed, in full, their advances, and after the company should have been provided a working capital of $200,000, and after the complainant should have received his one-twentieth of the capital stock. The complainant was to receive one-twentieth of the whole capital stock, which Varnum and Aspinwall should decide to be the amount of the capital, which the value of the lands would admit. He had no control over their actions; his right was fixed by the agreement. Varnum and Aspinwall, in consideration of being admitted to an equal participation with Cowles in the benefits and advantages to be derived from the contract, agreed to provide *all* the funds necessary to complete the contracts embraced in the schedule to the agreement, and the title was to be conveyed to them; and as *between them and Cowles*, they were to hold the said lands (until disposed of as thereinafter mentioned,) for their joint and equal benefit, with a lien, however, for *reimbursement*, (in the mode afterwards provided in the agreement,) as paramount to the joint and equal benefit aforesaid. But they were to dispose of the lands in the mode provided in the agreement, that is to say, they were to form *a company* under a designated Act of Maryland; they were to fix *the capital* of said company at such sum as they should consider the value of the lands would admit, and the *stock* was to be divided into shares of $100 each. They were then to convey the whole of the lands as they acquired the titles to the respective parcels, in payment of said stock, and the stock was to be issued in their names; the stock so issued by them was to be disposed of by them in the manner specified in the 5th clause of the agreement. One-twentieth of the whole amount was to be transferred, at the proper time, to the complainant. It was irrevocably *dedicated* to him by mutual consent of the parties to the agreement; it was to be transferred to him specifically *as stock*—his interest being not a proportionate share of the proceeds of the sale of the stock, but an *aliquot* definite portion of the specific stock. The *residue* of the stock was subject to the operation of the pro-

vision of the agreement, that *sufficient* should be sold for the two purposes, to *reimburse* Varnum and Aspinwall their advances, and to provide for the company a working capital of $200,000; although, in expressing their intention, the parties mentioned, first in order, the reimbursement of the outlay, they might, without any change of intention, have mentioned first in order the working capital. It was intended that out of the proceeds of the authorised sales, both sums should be raised, and that the balance of the stock remaining (after deducting the one-twentieth dedicated to the complainant, and after selling *sufficient of the residue* to accomplish the objects of *reimbursement*, and of providing a *working capital*,) should be equally divided, that is to say, one-half to Cowles and the other half to Varnum and Aspinwall. This *one-half* of the balance of stock remaining was the only consideration for the assignment by *Cowles* of his supposed valuable interest in the lands; and the other half was the only consideration for the assumption by Varnum and Aspinwall, of the risks, personal duties and responsibilities of the very delicate commission which they assumed to execute, and of the hazardous speculation which they undertook to carry out. They were to advance money without right of reclamation in case of loss; they were to perform labor without remuneration, in case there was no profit.

Tuck, J., delivered the opinion of this court.

The only subject before us on this appeal, is, the construction of the agreement of January 24th, 1853.

The rules of interpretation asserted on the part of the appellee, cannot be questioned; but they are all subordinate to the leading principle, that the intention of the parties, to be collected from the entire instrument, must prevail, unless inconsistent with some rule of law. And the maxim, that the words of a writing shall be taken most strongly against the party employing them, "applies only to cases of ambiguity in the words, or where the exposition is requisite to give them lawful effect. It is a rule of strictness and rigor, and not to be resorted to but where other rules of exposition fail. The

modern and more reasonable practice is, to give to the language its just sense, and to search for the precise meaning, and one requisite to give due and fair effect to the contract, without adopting either the rule of a rigid or of an indulgent construction." 2 *Kent*, 556. *Carroll vs. Granite Co.*, 11 *Md. Rep.*, 411.

Applying these cardinal rules to the present instrument, we have not been able to reach the conclusion to which the able arguments of the appellee's counsel sought to direct us. We must regard the whole agreement, the nature of the transaction in hand, its objects and purposes, and the means and manner of accomplishing them, as disclosed by the instrument itself, and looking to these, we cannot doubt that the parties designed that the right of the appellee should be contingent, and not fixed and certain, to the degree now contended for on his behalf.

The agreement and schedule show that Cowles had speculated in coal lands, and made large purchases, which he transferred to Varnum and Aspinwall, who were to provide funds to meet his engagements. The third article expressly provides that they should hold the lands "subject to their claim, to be reimbursed the cost thereof, and all expenses in relation thereto," for the benefit of themselves and Cowles, as thereafter provided. A joint stock company was to be created, and these lands converted into stock, to be issued to the appellants, who were to deal with the shares as provided in the fifth article, on a portion of which the appellee mainly relies, in support of his claim to priority. Now the first question that naturally arises here is, whether it was designed that Varnum and Aspinwall should be in any worse condition after the formation of the company than before? that is to say, were they, or not, to hold the stock as they had held the lands, as a security for their outlay? We think that only one answer can be made to this inquiry, and that is, that it was the intention that the stock should stand as a substituted security in place of the land, and that the fifth article must be deemed, as far as the appellants' reimbursement was contemplated by

63     v.17

the parties, as intended to accomplish that end. Considering the merits of the case, we can see no possible objection to this view of the agreement, while considerations of justice demand it. The question then arises, is there any thing in the fifth or any other article, by which they have stripped themselves of the security provided by the third? If it were not for the words "one-twentieth part of the *whole capital* stock," we suppose that no such pretension could be advanced. But that clause does not stand alone. It appears to us to be impossible to separate it from the context, and give it the meaning contended for, without defeating the manifest object of the parties as to other ends contemplated at the time of making the agreement. It is said that these words created a positive and fixed right in the appellee to that portion of the stock, without reference to the result of sales, or other contingency. We may here remark, that if the parties had so intended, it was easy to have placed the matter beyond doubt. This clause is the last of the fifth article, by which certain duties had been imposed on the appellants, which it might be impossible for them to discharge, if the appellee's construction were to prevail. We think the order of sentences and the phraseology imply something more than a succession of events; for the transfer to the appellee was to be made after certain other things were to have been done. Let us see what these requirements are. The appellants were, "out of the stock so issued to them, to sell sufficient to reimburse them the cost of the land," &c. Was not the whole stock placed at their disposal, if it required all? "Sufficient" means enough, what may be necessary to accomplish an object; and how any other effect can be ascribed to the word, as here employed, we do not perceive, unless we adopt the suggestion made at the bar, that it must be intended that the parties meant sufficient of the *disposable* stock. But here we would be met by the difficulty, that if the agreement, as it stands, means one thing, we cannot, by implication, interpolate a word which would give it a different effect. The most reasonable idea, in case of any doubt upon the words, would be, that those who had projected the enterprise, and advanced

their means in furtherance of the common object, should, out of the property, be indemnified against loss, and not be postponed for the benefit of another, who, as far as the paper shows any thing on the subject, had furnished no consideration for the stipulation in his favor. By the interpretation of the appellee, he would be preferred not only to Varnum and Aspinwall, as to their outlay, but also to Cowles as to his $15,000, "expended in obtaining the contracts, and in and about the lands," which is made a charge on the lands by the sixth article, as the claim of Varnum and Aspinwall had been by the third.

But suppose we confine ourselves to the last clause of the fifth article, on which reliance is placed by the appellee, we must take it all together, and then the inquiry is, what effect are we to give to the words "after" and "next?" It is said, that these indicate only the order of time in which certain things were to occur. If this were so, it might happen that the appellee would never enjoy what he insists is a fixed and ascertained amount of stock, because the transfer was to be made *after* the sales and payment aforesaid; that is, sales of stock sufficient for all the purposes set forth in the preceding clause of the article, and until these ends were gratified, we do not perceive how Varnum and Aspinwall could be called on to make the transfer. The words "one-twentieth of the whole of said stock," are certainly plain enough, and sufficiently indicate the amount the appellee was to receive, but, taking the whole of the clause, and giving to every word the meaning which we think they may bear consistently with the objects of the transaction and the mode of their accomplishment, as defined in other parts, the most reasonable interpretation is, that this expression should secure to the appellee the amount of stock mentioned, in preference to the division between the other parties, but not in priority over the claim that Varnum and Aspinwall might have for their outlay. This we take to be in harmony with the words of the entire instrument, and, at the same time, quite consistent with the equities of the transaction. For, although it may be assumed that the appellee, by force of the clause in his favor, had an

interest which a court of equity would enforce, we do not suppose it can be regarded as of a higher dignity than that of the parties by whom the enterprise was commenced, and whose means were embarked in its prosecution, and for whose reimbursement express provision was made in the third and sixth articles. These are as plain in their words and meaning, when considered alone, as the clause relied on by the appellee, and would seem to address themselves to our acceptance as well; and both parties relying on separate clauses, the only safe guide is to consider them all as comprising one instrument, to be interpreted by the intent of the parties, to be gathered from the whole.

It is true that instruments cannot be construed by what parties may have done under them, 1 *H. & G.* 74; but we think that courts may regard the nature of the transaction, and probable results; that is, such as may be supposed to have entered into the minds of the parties at the time the agreement was made; for justice seems to require that both parties should be bound by a consent of the mind to the same thing in the same sense. We suppose that all the parties concerned in this speculation—as speculators generally do—looked to large profits; none apprehended any loss; and in this confidence they did not provide in terms for contrary results. But, if loss had been apprehended, and they had purposed to provide for such contingency, can any one believe that Cowles, and Varnum and Aspinwall, would have consented to purchase and pay for the lands, bear all the losses, and save harmless the only person concerned who does not appear to have advanced any thing; we should rather say, allow him only to make a profit of the business?

The examples cited on the question of construction, from cases where wills and testaments were the subjects of consideration, we think, do not apply here. This case, and the like, should be governed by the principles recognized in deeds, and there are many in this court where priorities have been allowed, upon words and phrases, to which the rules observed in the construction of wills would have applied as reasonably as to the present agreement.

With these views of the contract, the decree of the court below must be reversed, but a final decree will not be passed at this time, inasmuch as there is a cross-appeal pending. The question of costs will be disposed of at the hearing of that appeal.

*Decree reversed.*