SARAH ELIZABETH TRACY *et al.,* Plaintiffs in Error, *v.* THE CITY OF CHICAGO *et al.,* Defendants in Error.

### ERROR TO COOK.

The intention of the parties to a written contract, as deduced from a fair construction of the words used by them, must govern, in deciding questions as to their rights under it.

A construction given to the words of the contract in this case, as applied to the word " front," in extending boundaries.

THIS was a bill in chancery, by Elisha W. Tracy, the ancestor of the present plaintiffs in error, against defendants in error, to compel a conveyance of certain land to him, from the City of Chicago, and to restrain the other defendants from setting up any claim or title thereto. These defendants, who were the owners of original lot 5, block 22, as shown in Plat No. 1, had received a conveyance from the city, of the new lot 5, (Plat No. 2), and were in possession, and the land claimed by complainant was a portion of said lot 5, as shown by the dotted line. The complainant was the owner of lot 8, in block 22, as laid out on the Plat No. 1, and his claim to the land in controversy was based on an agreement entered into by him and other owners of property fronting on West Water street, on the one part, and the City of Chicago on the other. The city had passed certain ordinances, containing a proposition to vacate old West Water street, and lay out a new street instead, offering to take from the owners of the property fronting on the original street, such portion of their respective lots as would be needed for the proposed street, and to convey to them in exchange, on their performance of certain conditions specified in the ordinances, " the premises in front of their respective lots."

The Plat marked No. 1, shows the condition of the property before the change. Plat No. 2 shows how the lots were bounded after the proposed change was made.

Tracy et al. *v.* City of Chicago et al.

PLAT No. 1.

PLAT No. 2.

The proposition was accepted, and conveyances made by the city, to the respective owners, so that they became the owners of the lots which are shown in Plat No. 2, and which are numbered in the same manner as their original lots, the city insisting that such conveyances were in accordance with the contract. Complainant, however, claimed that this construction was not the true one, and that under the contract, he was entitled to more land ; that his north line ought to run, from his north-east corner, in a direction at right angles to the course of the river, till it reached the water, in the manner indicated by the dotted line in the plats, which runs from the north-east corner of lot eight, in a direction at right angles to the line of wharfing block M.

During the progress of the cause, the original complainant died, and the suit was revived in the name of the present plaintiffs in error.

The cause was tried before MANIERRE, Judge, and a decree *pro forma* entered, dismissing the bill.

The only question in this case is, as to the construction of the contract. The ordinances referred to, were as follows :

" 1st. The city will cause to be dredged, to the depth of eleven feet below low water mark, so much of the west bank of the south branch of the Chicago river as lies east of a direct line drawn from a point one hundred and twenty-two and thirty-five one-hundredths feet ($122\frac{35}{100}$) east of the south-west corner of lot 9, in block 51, in the original town of Chicago, to a point two hundred and thirty feet and seventy one-hundredths of a foot ($230\frac{70}{100}$) east of the north-west corner of lot one (1), in block forty-four (44), in said original town of Chicago ; and thence north, to a point two hundred and thirty feet and seventy one-hundredths of a foot ($230\frac{70}{100}$) east from the north-west corner of lot one (1), in block twenty-nine (29), in said original town of Chicago ; thence to a point two hundred and thirty-nine (239) feet east of the south-east corner of lot seven (7), in said block twenty-two (22) ; thence to a point one hundred and forty-three feet and nine-tenths of a foot ($143\frac{9}{10}$) east of the north-west corner of lot two (2), in said block twenty-two (22) ; said east line to be so drawn that the same shall be seventy (70) feet at right angles from the east line of the new street hereinafter mentioned, and as laid down upon the accompanying diagram, marked Diagram of proposed excavation on West Side.

" 2nd. The city will lay out a new street, extending from Madison street to Fulton street, seventy-five (75) feet in width, in such a manner that the east line of said new street shall commence on Madison street, at a point eighty (80) feet east of the south-east corner of lot ten (10), in block fifty-one (51), in said

original town ; and thence run, in a direct line, to a point one hundred and sixty feet and seventy one-hundredths $(160\frac{70}{100})$ of a foot east of the north-west corner of lot one (1), in block forty-four (44), in said original town ; thence north, to a point on the south line of lot nine (9), in block twenty-nine (29), one hundred and sixty feet and seventy one-hundredths of a foot $(160\frac{70}{100})$ east of the south-west corner of said lot nine (9), in block twenty-nine (29) ; thence north, in a direct line, to a point one hundred and sixty feet and seventy one-hundredths of a foot $(160\frac{70}{100})$ east of the north-west corner of lot one (1), in block twenty-nine (29) ; thence north-westerly, in a direct line, to a point one hundred and fifty feet and one tenth of a foot $(150\frac{1}{10})$ east of the south-east corner of said lot seven (7), in said block twenty-two (22) ; thence north-westerly, in a direct line, to a point fifty-five (55) feet east of the north-west corner of lot two (2), in block twenty-two (22), in said original town, and seventy (70) feet, at right angles, distant from the water line first herein mentioned ; including in said street, also, all of the land in block fifty-one (51) west of the said east line, and between it and the west line of the alley dividing said block, and also including in said street all of that part of lot eight (8), in block twenty-two (22), which lies west of the said east line of said new street.

"3rd. The city will discontinue so much of West Water street as lies between the east line of said new street and the river, and will convey to the respective persons owning lots in said blocks the premises in front of their respective lots, in exchange for the land taken for the new street, the owners of said lots paying or securing to the city, in manner required in the proposition for the adjustment of the wharfing privileges on the south side of the Chicago river, sixty (60) per cent. of the following sums, and securing, in a manner to be approved by the mayor of said city, the other forty (40) per cent., to be paid when required by said city to pay for the dredging aforesaid."

(Here follows a list of the amounts to be paid on account of each lot.)

"*Be it ordained by the Common Council of the City of Chicago* :

"Sec. 1. That so much and such parts of West Water street as lie in front of blocks fifty-one (51), forty-four (44), twenty-nine (29), and twenty-two (22), in the original town of Chicago, and only such parts of said street as shall be mortgaged to the city of Chicago, as hereinafter provided, or the owners of which, or some other person or persons on their behalf, shall cause to be paid or secured to the city in such manner as shall be approved by the mayor or acting mayor of

said city, the amounts required to be secured to the city by mortgage or otherwise, or paid to said city as hereinafter provided, be and the same are hereby discontinued and vacated : *Provided,* that the new street, extending from Madison street to Fulton street, specified in the 2nd section of the proposition for disposing of the wharfing privileges on West Water street, contained in the report of the committee on wharfing privileges, concurred in by the common council, January 29th, 1849, shall be laid out, and the damages occasioned thereby paid without charge or expense to said city, except the expense of laying out the street and of assessing and collecting said damages within such time as shall be determined by the common council. *And provided, further,* that all persons owning lands adjoining said West Water street shall consent in writing to the discontinuance of so much of said street as is hereby discontinued and vacated ; or such assent shall be dispensed with by act of the legislature of the State of Illinois.

" SEC. 2.   Before the vacation and discontinuance of any part or portion of said street, as herein contemplated, shall take place, a mortgage of such parts or portions shall be executed to said city by the respective owners of the various parts or portions of land or town lots in said blocks which are opposite to or front on such parts or portions of said street as are proposed to be vacated, to secure the payment of sixty per centum of the sums set opposite the following lots respectively, or in that proportion for any part or portion of a lot fronting said street, said mortgage to be drawn and executed in such form and manner as shall be approved by the common council or the mayor or acting mayor, and to be deposited with the city clerk of said city, within such time from the date hereof as shall be determined or required by the common council, and said mortgage to be so drawn as to contain in substance the provisions of the twelfth (12) section of the proposition for settling wharfing privileges on South Water street and East Water street, north of Randolph street, passed in common council, February 11, 1848, or said sixty per centum shall be otherwise secured or paid to said city in such manner as shall be approved by the mayor or acting mayor of said city.   (Here follows a list of the amounts to be paid by each lot.)   And shall likewise pay or secure to said city, in such a manner as shall be approved by the mayor or acting mayor of said city, the remaining forty (40) per centum of said sums set opposite the aforesaid lots respectively, as aforesaid, to be paid when required by said city, for the purpose of dredging the west bank of the south branch of the Chicago river, as specified in the first section of said proposition for disposing of the wharfing privileges on West Water street.

" Sec. 3. In case it should be judicially determined, upon a bill to be filed under the act, entitled, ' An act to adjust and settle the title to the wharfing privileges in Chicago, and for other purposes, approved February 27, 1847,' that upon the discontinuance or vacation of said parts of said streets, the fee of the land now contained in the same is in some other party or parties than the city of Chicago, or the said respective owners of the various portions of land or town lots aforesaid, fronting the same, then this ordinance shall be null and void.

" Sec. 4. Ten feet, next and adjoining the river, of said wharves, shall be and always remain an open wharf, upon the same conditions and restrictions as contained in the settlement of the wharfing privileges on the south side of the Chicago river."

W. T. Burgess, and C. Beckwith, for Plaintiffs in Error.

Scates, McAllister & Jewett, for Defendants in Error.

Caton, C. J. The question in this case is, what did the parties intend and understand by their contract, which consists, on the one side, of the proposition by the city, contained in the ordinances for the vacation of old West Water street, and the opening of the new street of the same name, and the acceptance of that proposition by the proprietors of the lots in the rear blocks. The proof does not show that the map or diagram attached to the answer, and marked A., was in Scammon's hands at the time alleged, or that Tracy ever saw it, so that we cannot say that he accepted the proposition as explained by that diagram; although, in the first section of the first ordinance, some diagram is referred to, which should have been proved and identified, in order to make it constitute a part of the contract. We must, therefore, rely upon the language of the ordinances, illuminated by the surrounding circumstances, in order to arrive at the true meaning of the parties. The ordinances propose to vacate West Water street in front of blocks fifty-one, forty-four, twenty-nine, and twenty-two, and to lay out a new street as therein proposed, and convey to the owners of lots in those blocks what remained in old West Water street in front of their lots, respectively, to a certain specified line on the margin of the river; and the question to be determined is, What did the parties intend, by the land lying in front of those blocks and of the lots, respectively? When we look at the maps, and trace out the lines of the proposed river excavation and of the new street, and apply an ordinary knowl-

edge of city property and streets, and business facilities in cities, we cannot doubt what was intended by the word "front," as used in these ordinances, and how it was understood by all parties.

And first, what did the city intend to vacate and make private property, in front of those respective blocks? Did they intend, in order to ascertain what lay in front of those blocks, to project the north and south lines of the blocks directly to the river, or did they intend to diverge those lines from the northeast and south-east corners of those blocks, so that they should strike the river at right angles to its course? A glance at the maps, as furnished by the complainant, shows, that to project the lines as last suggested, would angle or diverge the east ends of West Randolph and West Washington streets to the south, and the east ends of West Lake street and of Fulton street to the north, as they approach the river, through the property to be conveyed to the owners of the property in the rear of them. We shall not waste time to show that such could not have been the meaning of the common council in passing these ordinances, nor the understanding of the other parties in accepting the proposition which they contain. This is too patent to admit of a doubt. No change was designed to be made in the courses of these streets, and we cannot doubt that all understood that they should approach the river opposite those on the east side, as originally laid out. The symmetry of the city, facilities for bridges across the river at those streets, convenience of business, and the manifest interests of all parties, point unerringly to this, as the meaning of the ordinances and the intention of all parties. Indeed, it was not denied, or even questioned, upon the argument, that such is the meaning of the word *front*, as contained in the first section of the second ordinance.

If the meaning of this word, as here used, is such as to require a direct projection of the north and south lines of the several blocks, to the river, without regard to their courses, in order to determine what portion of West Water street was vacated, it seems to us very plain that the same word was used in the same sense in the third section of the first ordinance, and in the second section of the second ordinance, describing the property to be deeded to the owners of the property in the rear of the vacated street. This may be more apparent by quoting these several passages, and placing them together.

The first section of the second ordinance, providing for the vacating of the street, says: "That so much and such parts of West Water street as *lie in front* of blocks fifty-one (51), forty-four (44), twenty-nine (29), and twenty-two (22), in the original town of Chicago, * * * be, and the same are hereby

discontinued and vacated." As before stated, we cannot doubt that it was the intention of this ordinance, to project the north and south lines of these blocks direct to the river, in order to describe or ascertain what portion of West Water street was vacated, as lying in front of those blocks.

The language of the third section of the first ordinance is this : " The city will discontinue so much of West Water street, as lies between the east line of said new street and the river, and will convey to the respective persons owning lots in said blocks, *the premises in* FRONT *of their respective lots,* in exchange," etc.; and the language of the second section of the second ordinance, describing the same premises to be conveyed, but for another purpose, is this : " Before the vacation or discontinuance of any part or portion of said street, as herein contemplated, shall take place, a mortgage of such parts or portions shall be executed to the city, by the respective owners of the various parts or portions of land or town lots in said blocks, which are opposite to, or front on such parts or portions of said street as are proposed to be vacated," etc. Now, here the property proposed to be conveyed, in one place is described as lying in *front* of the lots, to the owners of which the conveyance is to be made, and in the other, as being the lots *opposite* to or fronting on the property. No attempt has been made to assign any reason why a different rule should be adopted for ascertaining what lies in front of or opposite to a lot, from that by which it must be determined what lies in front of a block. Manifestly, all understand the word *front* to mean the same, in both cases. If we adopt the complainant's rule for determining what lies in front of his lot, and so project a line from his north-east corner to the river, in a direction at right angles to the course of the river, for his northern boundary, we must, by the same rule, determine his southern boundary in the same way, and so he would not increase his river front, nor the quantity nor value of land to which he is entitled ; but this southern line he has quite ignored in the bill, setting up no claim as to how that should be run, leaving, however, the inference, that he is quite willing to have the south line extended due east direct to the river, without regard to the course of the stream. If we could be persuaded to extend the black lines direct to the river, for the purpose of determining what is vacated in front of the blocks, and adhere to the same principle for the complainant's south line, but adopt his rule only for determining his north line, then indeed he would gather substantial fruits from this suit, but without this, his success would be valueless. Nor would he derive any valuable benefits, should we divide the premises in front of this block among the several

owners of the lots, as if it were an accretion to those lots, as it was urged, upon the argument, should be done. That rule would require us to distribute the outer front of the accretion to the owners of the lots, in proportion to their several fronts, upon the inner line of the accretion. Judging from the maps, this would give the complainant, if we run the south line of block 22 direct to the river, just about, if not precisely the land which he gets by projecting both his lines direct to the river, as is proposed by the city, and, as we think, was the intention of the parties. But, if we diverge the south line of the block, according to his rule, he would be largely the loser.

Placing this case, as we do, upon the construction of the contract, and the manifest intent of the parties, we have not deemed it necessary to review the cases cited, determining the rights of parties to salt marshes or meadows adjoining their uplands, nor to go at length into a consideration of the principles by which alluvium and accretions are distributed. In our view, these have nothing to do with this case. It depends solely upon the meaning of this contract, as expressing the intention of the parties, and of this meaning and intention, we have no doubt.

The decree dismissing the bill, is affirmed.

*Decree affirmed.*