Marshall O. Roberts, Respondent, *v.* George Opdyke, Appellant.

Where by a clause in the charter-party for a voyage from N. Y. to O. and return, it is stipulated, that the ship is to carry out "seven hundred tons measurement of assorted cargo, or more, if that does not make her draw over fourteen feet of water, and to bring back six hundred hogs-heads of sugar, or its equivalent, or more, in case her draft of water does not exceed fourteen feet," and on being laden with 360 tons of

assorted cargo for the outward trip, she drew fourteen feet of water and the owner refused to permit the charterer to further load her—*Held* (JAMES, J., dissenting), that such a refusal was no violation of the clause, and the owner was entitled, upon performing the voyage, to recover the money payable by the terms of the charter party.

By the true construction of the language of the clause as to the outward cargo, when taken in connection with the succeeding provision, as to the return trip, and the circumstances of the case, the owner was bound to take only such assorted cargo, whether occupying more or less than 700 tons of measurement, as would not sink the ship below a draft of fourteen feet.

*It seems*, that in such cases, the strict and full performance of the stipulations of the charter-party by the owner, as a condition precedent to his right to claim any portion of the freight from the charterer, is not waived by the latter's receiving the cargo at the port of delivery and reloading her with a cargo for the return trip. DANIELS, J.

(Argued on the 16th day of January, 1869, and decided on the 22d of March, 1869.)

THIS was an appeal from the judgment entered by direction of the General Term of the Superior Court of New York, upon a verdict ordered for $10,516.08, in favor of the plaintiff, being a portion of the freight unpaid, of the steamer Philadelphia, upon a voyage from New York to New Orleans and back. The plaintiff was the owner of the steamer, which was chartered by the defendant for a round trip from New York to New Orleans and return, at the stipulated freight of $25,000, payable on her arrival at New York. $15,000 had been paid by the defendant.

The vessel was 1,000 tons by measurement.

The sole question in this case arises upon the following clause in the charter-party:

"It is understood that the steamer is to carry out to New Orleans seven hundred tons measurement of assorted cargo, or more, if that does not make her draw over fourteen feet of water, and to bring back six hundred hogsheads of sugar, or its equivalent, or more in case her draft of water does not exceed fourteen feet."

The cause came on for trial, and the issues made by the answer were waived, and the following stipulation was made:

" *First.* The making of the charter-party, the voyage of the steamer to New Orleans, her return to New York, her tonnage, and the amount paid on account of the charter-money, were all admitted, as stated in the complaint, and are not denied by the answer.

" *Second.* It is admitted by the plaintiff, that the defendants were prepared to load the steamer with 700 tons measurement of assorted cargo, but that when she was loaded to the extent of $361\frac{95}{100}$ tons with the goods contained in schedule No. 1, the plaintiff refused to carry any more, on the ground that she then drew full fourteen feet of water. It is also mutually admitted, that the vessel was loaded by the defendant, and the cargo received by the plaintiff, and that the vessel drew full fourteen feet of water. It was also proven, that the balance of the charter-money with interest amounted, at the day of trial, to $10,516.08.

" And both parties, in open court, admitted that there were no disputed questions of fact in the case, and that the sole question is a question of law arising upon the legal construction of the clause in the charter-party, in the words following:

" ' It is understood that the steamer is to carry out to New Orleans seven hundred tons measurement of assorted cargo, or more, if that does not make her draw over fourteen feet of water, and to bring back six hundred hogsheads of sugar, or its equivalent, or more in case her draft of water does not exceed fourteen feet.' "

" And thereupon the court directed the jury to find a verdict for the plaintiff in the sum of $10,516.08, and the jury so found. The defendant's counsel excepted.

" And the court ordered the exceptions to be heard in the first instance at the General Term, and the judgment to be meanwhile suspended. The General Term ordered judgment to be entered for the plaintiff, and the defendant appeals to this court."

*John K. Porter*, for the appellant.

*Edwards Pierrepont*, for the respondent.

HUNT, Ch. J. It appears that, when 362 tons of cargo had been placed upon the steamer, she drew fourteen feet of water. The complaint of the defendant is, that he was not allowed to load her with 700 tons in weight, or that she could not carry 700 tons in weight without drawing more than fourteen feet of water. It is insisted, that the contract gave the defendant the absolute right to load the vessel to the extent of 700 tons, in weight, and even to a greater weight, provided such excess did not sink her below fourteen feet. It is argued, in effect, that tons in weight and tons in measurement are the same thing; and that the expressions are simply different terms to indicate the same idea. This is an error, I apprehend. A ton, in measurement, is forty cubic feet. (McCulloch's Com. Dic.; Webster's Dic.) A ton, in weight, is 2,240 pounds. A vessel, having the capacity of 1,000 tons measurement, has space or room to the extent of 40,000 cubic feet. This, however, has nothing to do with the question of the weight she can carry. If this space is occupied by straw goods, wooden ware, or the like, the whole space might be occupied, without sinking the vessel to the depth of fourteen feet. If, on the contrary, the cargo consisted of lead or iron, the depth might easily be obtained before one-tenth of the space should be occupied. There is no identity, nor even similarity between tons of measurement and tons of weight. There is no more resemblance than between the lightness of the day, and the lightness of the cork, or other material substance. In each instance, the same word is used, but, in a sense and meaning, quite different.

The plaintiff stipulated, that his vessel should carry out 700 tons measurement of assorted cargo, if she was not thereby made to draw more than fourteen feet of water. We are not informed, whether the term, an assorted cargo, has any especial commercial signification, or, if so, what it is. If it stands upon its general meaning, it imports the idea of a miscellaneous cargo; a freight distributed into various sorts, or kinds, or classes, in short, whatever the defendant should reasonably select, as the kinds or sorts of goods, with

reference to his own interests. If the defendant chooses to mingle railroad iron, bar lead, pork, beef, molasses, dry goods, crockery, wooden ware, straw goods, he has the right to do so, and he can load the vessel with these articles, until she draws the given depth of water. It is not stated in the admission, that she was loaded to 362 tons by measurement with the goods enumerated, and that she was unable to carry these tons of measurement without exceeding her depth of water. It is simply said, that she was loaded to the extent of these tons, " with the goods contained in schedule No. 1." This schedule contains beef, pork, ham, lard, lemons, eggs, brooms, which, to an uninstructed reader, would import a mixed or assorted cargo. How many tons of measurement these goods occupied is not stated. The footing up is forty-four tons, by weight, ninety-one and an eighth tons, by measurement; " our cargo, 225, 34, 40," with a total below of " 360, 39, 40." Whether this final result is tons weight, or tons measurement, or tons of any character, does not appear, and whether the particular articles specified in schedule number one, form either and which of these items, is not clear. If this footing is of tons by measurement, and if it falls fairly within the description of an assorted cargo, then the defendant is in a position to raise the first point, on the writing, to wit: That the limitation of fourteen feet only applied, in the case of a cargo exceeding 700 measured tons. When it simply appears that freight to the amount of 362 tons was placed on board, but it does not appear that it was tons by measurement, and does not appear that it was an assorted cargo, the question is not reached.

Assuming the question to be fairly before us, the defendant can only succeed in his defence upon proof that the plaintiff refused to allow the freight to be put on board, although the fourteen feet draft of water had not been reached. This was the defendants' claim, in his answer : " Fourth, that when the said vessel departed on her said voyage, loaded as aforesaid, she neither carried seven hundred tons cargo, nor did she draw fourteen feet of water." The defendant was entitled to load

with freight to the extent of the storage room of the vessel, without limit, except as regulated by the draft of water. That limit was for the plaintiff's security, and was inexorable. This qualification applies to the 700 tons, as well as to the expression, " or more." The fair ·construction of this clause for the outward, as well as for the return voyage, was, that this draft of water, should, in no case, be exceeded, and under the circumstances of this case, there is no contract to carry any amount, except subject to this limitation. I can discover no ground of defence in any branch of the case.

Judgment should be affirmed with costs.

DANIELS, J.    This action was brought to recover the amount unpaid on the charter of the steamer Philadelphia, for a trip from the city of New York to New Orleans and back.    The plaintiff was the owner of the steamer, and the defendant agreed to pay him for her round trip the sum of $25,000.    This compensation was to be paid upon the delivery of the cargo, brought by the steamer from the city of New Orleans, at the city of New York, which was to be taken on board after the transportation and delivery of an outward cargo from the city of New York to the city of New Orleans. The transportation and delivery of these cargoes, therefore, from the nature and effect of the charter-party, formed a condition precedent to the plaintiff's right to the money which it was stipulated the defendant should pay for the use and employment of the steamer ; and it was indispensable, that a performance, or waiver of this condition should be established by the evidence given upon the trial, before the plaintiff could entitle himself to a judgment for the amount remaining unpaid.    (*Oakley* v. *Morton*, 1 Kernan, 25 ; *Dermott* v. *Jones*, 23 How. U. S., 220.)    This was an affirmative part of the issue, resting upon the plaintiff.    It was not for the defendant to show that it had not been performed or waived, but for the plaintiff to prove that it had.    It was the fact on which his right to recover the money was made to depend, and he could only recover by proving the existence of it.

The plaintiff claimed that he had made such proof. Whether he had or not depends upon the construction which should be given to the charter and the agreed statement of facts, read upon the trial. The defendant claimed that it had not been performed, because the steamer was not shown to have taken an assorted cargo of 700 tons measurement from New York to New Orleans, on her outward trip.

By the statement of facts agreed upon, it was admitted that the defendant was prepared to load the steamer with 700 tons measurement of assorted cargo; and this was the only description of cargo, which, by the terms of the charter, he was at liberty to load her with on her outward trip. But there was no express admission that any part of this 700 tons was laden upon the steamer. On that subject, the admission was, that when she was loaded to the extent of $361\frac{95}{100}$ tons, with the goods contained in schedule number one, the plaintiff refused to carry any more, on the ground that she then drew full fourteen feet of water. This schedule forms a part of the case containing the exception, but there is nothing in it beyond the mere statement of the articles and their quantities, in any manner indicating that they belonged to that particular class of property which the terms "assorted cargo" would be ordinarily understood as including. But as no specific objection was urged to their quality in that respect, upon the trial of the cause, when it might have been obviated if it had been made, and as it did not appear that the defendant was prepared to load the steamer with anything but the 700 tons of assorted cargo, which it was admitted he was prepared to load her with, and he had no right under the charter to load her with any different description of property on her outward trip, and no objection appears to have been made to that which he did deliver on board of her on account of its not being of that particular description, it should be assumed that the property received by the steamer was of the kind known as "assorted cargo." It is the direct and logical inference from the statement of facts agreed upon, showing what had transpired in

the way of performing the stipulation contained upon this subject in the charter. And this inference is fortified by the statement of the plaintiff's refusal. It was that the plaintiff refused to carry any more; not any more of the goods mentioned in the schedule, for they were all on board of the steamer at that time. These terms, therefore, must relate to the 700 tons of assorted cargo, because it did not appear that the defendant had anything else that he was prepared to load upon the steamer. There was nothing whatever besides this assorted cargo to which they could relate. By thus construing the admission, it was that the plaintiff refused to receive or carry any more of the 700 tons of the assorted cargo, which the defendant was prepared to load her with, than the amount mentioned in the schedule and already taken on board.

If the steamer was bound by the charter to receive and carry 700 tons measurement of assorted cargo, then, by this refusal, the plaintiff refused to perform the condition precedent on which his right to the compensation was rendered dependent. And the judgment in his favor was erroneous. For the case contains nothing showing any waiver of this condition. It is fairly to be implied from it, that the defendant required the plaintiff to receive and carry the residue of the 700 tons. For, if he had not done so, there would have been no occasion for the plaintiff's refusal to receive any more of it. By not rescinding the contract, and re-possessing himself again of his property laden upon the steamer, he did not deprive himself of his right to insist upon the performance of the condition mentioned in the charter. To constitute a waiver in such a case where it is not expressly made, requires some positive act from which it may reasonably and fairly be inferred. (*Pike* v. *Butler*, 4 Comst., 360.) Insisting upon the performance of an act positively refused by the other party, can, by no legal intendment, be construed into a waiver. And that, in substance, is all that the defendant did on the occasion referred to.

The point is, therefore, directly presented, whether the facts agreed upon established the performance of the condition

contained in the charter. And this must be determined by the construction which the law requires to be placed upon that instrument. If, under that construction, the steamer was bound to take on the entire 700 tons measurement with which the defendant was prepared to load her, then, as the plaintiff refused to receive it, no recovery can be had in this action.

The charter, besides the usual stipulations inserted in such instruments, contained the stipulations that the whole of the vessel, including the use of the cabin for passengers, and the space between decks for carrying steerage passengers, except the necessary room for the accommodation of the crew, and stowage of the sails, cables, and provisions, should be at the sole use and disposal of the defendant during the voyage mentioned in it, and that no goods or merchandise whatsoever should be laden on board otherwise than from the defendant, or his agent, without his consent; and that the plaintiff would take and receive on board the steamer during the voyage all such lawful goods and merchandise as the defendant or his agents should think proper to ship.

These stipulations, standing by themselves, placed the entire carrying capacity of the steamer at the disposal and under the control of the defendant, leaving him at liberty to load her with such goods and merchandise, and to such an extent as he might deem proper, provided he did not, in so doing, violate the implied obligation arising out of the nature of the transaction, and resting upon him, that he should not overload her; that obligation, however, would still be general in its character, and it would not in all cases be a matter which could be definitely or readily determined whether it was violated or not; it seems to have been the purpose of the parties to render this obligation definite and certain under the circumstances, and also to place some restriction upon the defendant as to the kind or description of property he would otherwise have been at liberty to place upon the steamer; and in order to do that, for the clause, on account of these general provisions preceding it, is incapable of subserving any

other useful end, the stipulation more immediately involved in the present controversy, was added to the charter. That addition is in the following words: "It is understood that the steamer is to carry out to New Orleans 700 tons measurement of assorted cargo, or more, if that does not make her draw over fourteen feet of water, and to bring back 600 hogsheads of sugar, or its equivalent, or more, in case her draft of water does not exceed fourteen feet. From the nature of this clause, no doubt can be entertained, but that it was intended to be restrictive in its character. That clearly follows from its relation to, and its effect upon the preceding general, as well as indefinite stipulations, affecting its immediate subject matter. The important inquiry is, how far was it intended by the parties, it should extend in that direction. For the intention is the governing element in all these cases. Not as that intention might possibly have existed as a matter of fact, but as it has been disclosed by the terms the parties have in this instance employed for the purpose of expressing it. It is the intention which the parties have embodied in their words that is to be searched for and ascertained. And that must be consistent with the meaning of the terms they have made use of. Where it is doubtful, it may be sought after by a reference to the context, and to the nature of the contract. The construction given to the words must be a reasonable one, according to the subject matter of the agreement, and the motives which may fairly be supposed to have influenced the conduct of the parties in entering into it. (2 Kent, 7th ed., 718–19.) "The modern and more reasonable practice is, to give to the language its just sense, and to search for the precise meaning, and one requisite to give fair effect to the contract, without adopting either the rule of a rigid or of an indulgent construction." (Id., 721; Broom's Legal Maxims, 375–6; 2 Parsons on Contr., 6, 11; *Springsteen* v. *Samson*, 32 N. Y., 703; *Higgins* v. *Wasgatt*, 34 Maine, 305; *Metcalf* v. *Taylor*, 36 Maine, 28; *Williamson* v. *McClure*, 37 Penn., 402; *Tracy* v. *Chicago*, 24 Ill., 500; *Varnam* v. *Thurston*,

17 Md., 470 ; *Rose* v. *Roberts*, 9 Minn., 119 ; *White* v. *Booker*, 4 Met. (Ky)., 267.) And " to give effect to the intention of the parties, courts may transpose, or even substitute words for those used in the writing." (*Decker* v. *Furniss*, 4 Kernan, 611, 622.) And may also disregard their grammatical relations. (2 Parsons on Cont., 25 ; *De Nottebeck* v. *Astor*, 3 Kernan, 98.)

In view of these considerations and principles, could it have been intended that the defendant should be at liberty to place 700 tons measurement of assorted cargo upon the steamer when that would make her draw over fourteen feet of water? Some reason must have existed arising out of her capacity, or the peculiar nature of the waters which she was to navigate in making her voyage, that rendered such a limitation of her depth of water proper; otherwise it cannot be supposed that it would have been imposed. And if it did, it necessarily applied alike to the lading producing that consequence, whether it was 700 tons, or more or less than that quantity. The consequence designed to be avoided by qualifying the defendant's right to load the steamer with more than 700 tons, would prove equally as disastrous if it was produced by that, or even less than that quantity of lading. It could not, therefore, have been intended to prohibit it, when it was produced by more than 700 tons, and to sanction it where that precise quantity or any less than that should be the cause of it. The reason that would induce the prohibition of it in one case, would be equally as applicable and forcible in the others. The absurdity of rendering the right to load the steamer with a cargo exceeding 700 tons measurement, dependent on the circumstance that it should sink her no deeper than fourteen feet, and permitting that to be accomplished by a cargo of 700 tons, or less than that quantity, would be both manifest and striking. If it was desirable to avoid it in one case, it would be equally so in the other. And a party taking the precaution to prevent it by one means would be naturally expected to guard against it by the others. It is not, therefore, to be supposed that the plaintiff intended to

consent that the defendant should do by a 700 ton, or smaller cargo, what he had been particular to prohibit him from doing by a larger one. And in view of so direct an improbability, he should not be held to have provided for so absurd a result by his contract; unless that be the fair and reasonable import of the terms made use of.

The difficulty in the case arises out of the peculiar position of the relative "that." As ordinarily used, in conformity to the established rules of the language, it would relate to what is signified by the antecedent word "more," which, from its own connection or relation to the preceding word "cargo," clearly implied more cargo than 700 tons. But to restrict it to that alone, would be productive of the irrational results already referred to; and that would be inconsistent with the existence of anything like an intelligent purpose, connected with the use of it. The only reasonable signification that can be given to this term, in view of the subject matter, and the preceding stipulations of the charter, is to render it the relative of both the preceding words. And that will harmonize it with the object the parties most likely had in view, and intended to accomplish by it, which was to limit the cargo to be laden upon the steamer to that quantity that would place her no deeper than fourteen feet in the water. By doing this no violence whatever will be done to the language made use of. On the contrary, that construction will be more consistent than any other would be with what precedes, as well as what follows it, in the charter.

The succeeding portion of this particular stipulation very clearly shows this to have been the intention of the charter as to the return cargo. For it provides that 600 hogsheads of sugar, or its equivalent, or more, should be carried on that trip, in case the steamer's draft did not exceed fourteen feet of water. No relative whatever is used in this connection, but a general restriction is imposed on the quantity of the cargo to be carried from New Orleans to New York. The quantity mentioned, its equivalent, or more, was only to be laden on board in case that could be done without producing

a greater depth of water for the steamer than fourteen feet. It is true this did not refer to the outward cargo, but it directly affects the construction which should be given to the stipulation relating to that, because it tends to exhibit the actual intention of the parties as to that part of the enterprise; for no reason appears, and none can very well be imagined, that rendered it desirable to restrict the otherwise general rights of the defendant, as to this part of the voyage, that did not apply with equal force to the outward trip.

If the terms used in the clause under consideration had not rendered the right of the defendant, as to the extent to which he should load the steamer, dependent upon her depth of water, then he would have been at liberty to sink her, if that could have been done by 700 tons measurement of assorted cargo, a consequence which both parties must have intended to avoid. There is nothing in the contract, or in the facts agreed upon at the trial, defining the mercantile signification of the terms, assorted cargo, if, in fact, they possess any peculiar meaning in that department of business And for that reason they should be understood and applied in the construction of the charter in their popular and ordinary sense. As so construed, they would fairly and properly include any cargo constituted of different articles, or a fair assortment of different articles. And as many articles of the same bulk are much heavier than others, it follows that 700 tons measurement of one kind of assorted cargo would be much heavier than the same number of tons measurement of a different kind of assorted cargo. For instance, an assorted cargo of iron, lead, copper, pork, beef and flour, would in the same bulk very much exceed in weight one of wooden ware, agricultural implements and household furniture. A ton in measurement of the former would exceed in weight many tons in measurement of the latter; and a steamer whose capacity would enable her to carry 700 tons, and even more than that, in measurement of the latter kind of assorted cargo, would be unable to keep above water with half the quantity in measurement of the former quality of cargo. A ton measurement

contains forty cubic feet of space; and within that many tons
in weight might be placed, where it consisted of ponderous
articles while those of a lighter quality might be so assorted
and selected as to require as many tons in measurement to
constitute one in weight. It was in view of this possible
state of the circumstances that the provision or stipulation
alluded to was inserted in the charter; and that left the
defendant at liberty to make up the outward cargo of any
kinds of assorted cargo he might select, whether amounting
in measurement to 700 tons or more, provided the steamer
could carry it without sinking deeper than fourteen feet
in the water. It rendered it incumbent upon the defendant,
if he put 700 tons measurement or more of assorted cargo
on board, that it should be so selected as not to sink the
steamer deeper than fourteen feet in the water; it could not
have been intended that the defendant should be placed at
liberty by this clause, in any event, to overload the steamer
and thereby defeat the purpose both parties intended to
secure by entering into their agreement; and no such con-
struction is required by the contract, particularly when it is
considered in view of the circumstances under which it was
made, and the object to be accomplished in making and
performing it.

The measurement of the steamer was admitted to be over
1,000 tons, and from that circumstance it may very well have
been supposed that she was capable of carrying 700 tons
measurement, or more, as mercantile cargoes were ordinarily
selected and assorted; and that supposition would probably
in most cases prove to be the truth. But as it was apparent
from the nature of the business and kinds and descriptions of
property forming the subject of commercial transactions, that
this might not always be the case, prudence required the
imposition of the restriction mentioned for the purpose of
·insuring the safety of the steamer in the performance of the
charter; it was the clear purpose of the parties that the
steamer should not be laden to a greater depth of water than
fourteen feet by putting more than 700 tons measurement of

assorted cargo on board of her, and as the same necessity for avoiding that result existed whether it would be produced by that quantity, or less than that quantity, as that design is entirely consistent with the language made use of, it must have been intended that the same restriction should be imposed upon these as was applied to the former case.

The judgment should be affirmed.

All the judges concurring for affirmance except JAMES J., who was for reversal.

Judgment affirmed.